## COUNTY OF PROVIDENCE, SEPTEMBER TERM, 1863, AT PROVIDENCE.

PRESENT:

Hon. SAMUEL AMES, Chief Justice.
Hon. GEORGE A. BRAYTON, } Justices.
Hon. J. RUSSELL BULLOCK, }

## Walter W. Updike v. Louis J. Doyle and others.

No exception can be taken to a master's report because the master takes the accounts directed by the decree appointing him, on the ground that they are uselessly expensive. If the decree is wrong, it must be reformed by the court; but as long as it stands, it is imperative upon the master.

A bill by an excluded copartner, filed after the firm is broken up, for an account of the copartnership property and debts, for an injunction and receiver, and for the ascertainment of, and payment by his copartners to him of his share of the surplus, is, from its nature, a bill for the complete administration of the partnership property; and after a decree is entered granting the relief of the bill, the bill cannot be dismissed by the consent of the plaintiff and defendants, without that of the creditors of the firm, though not made parties to the bill; the decree being in the nature of a judgment for them all.

Updike *v.* Doyle and others.

Incoming partners may assume the debts of the concern with which they connect themselves; and this assumption may be proved, both at law and in equity; either by their express covenant or contract, or be inferred from the terms of it, or from the treatment of such debts by the firm, to the knowledge of the incoming partners, as the debts of the new firm.

THIS was a bill in equity, originally filed by Walter W. Updike against the defendants, Doyle, Bishop, Jackson, and the Rhode Island Bleaching and Cambric Works, a corporation. The bill stated, in substance, that in August, 1856, the defendant Doyle, being seized and possessed of a certain mill estate in Newport, known as the Coddington Mill estate, and a lot, called the Fountain lot, on Holland street, in Newport, together with certain machinery, tools, and implements for manufacturing, had, with said mill and machinery, for some time previous thereto, carried on the manufacturing business under the name of the Rhode Island Manufacturing Company; that upon a certain proposition in writing, that they should come into said firm with him, as copartners, by the complainant and the defendant Bishop accepted, on the first day of September, 1856, Doyle, Bishop, and the complainant entered into written articles of copartnership; and in consideration, amongst other things, of fifteen thousand dollars previously advanced by the complainant to Doyle, and that the complainant would become a partner with Doyle, and assume all the liabilities in said business, said Doyle, on the 27th day of September, 1856, executed and delivered to the complainant a deed, with warranty, of one-third of said mill property, and a deed of another third of the same to the defendant Bishop. The bill then went on to state, after transacting business as copartners together for a short time, the suppression by Doyle of the articles of copartnership, which were delivered to him, as treasurer of the newly formed firm, to keep, and by all the defendants, of Doyle's deed to the complainant, which had been committed to Doyle's hands to be recorded, and the present possession of the same by Bishop,—the exclusion of the complainant from the business of the firm,—the sale by Doyle of the third part of the mill estate and property, before sold to the complainant, to the Rhode Island Bleaching and Cambric Works, of which Bishop and the defendant Jackson were sole members,

with full notice of the plaintiff's rights and conveyance, before their said purchase, and the recording of the deed executed by said Doyle to said corporation; that Doyle subsequently, on the 6th day of November, 1856, sold out his interest in said mill property and concern to Bishop, and became and was wholly insolvent; and that, on the 18th day of the same November, Bishop published a notice that he had ceased to be a member of said copartnership since the 6th day of that month. The bill prayed, that Bishop might be decreed to deliver up to the complainant Doyle's deed to the complainant; that the title of the Rhode Island Bleaching and Cambric Works under Doyle's subsequent deed to them might be declared void as to the complainant, and his title in priority established; that Bishop might be decreed also to produce certain books and papers of the Rhode Island Manufacturing Company, for the examination of the complainant and his counsel; that Bishop, Jackson, and the Rhode Island Bleaching and Cambric Works might be enjoined from operating said mill and machinery, and exercising further control over the same, and Bishop and Doyle from collecting the debts and demands belonging to said copartnership; that a receiver might be appointed to receive and collect all moneys which may be coming to the credit of said firm; that an account might be taken of all and every the said copartnership dealings and transactions, from the time of the commencement thereof, and also of the moneys received and paid by the complainant and said Doyle and Bishop respectively, and that Doyle and Bishop might be decreed to pay to the complainant what, if anything should, upon the taking of said accounts, appear to be due to him,—the complainant being willing and offering to them or either of them what, if anything, should appear to be due to them or either of them from him,—and for further relief.

The bill was filed at the September term of this court, 1856. The defendants, with the exception of Doyle, answered the same; and pending the taking of proof, the complainant, having become insolvent, in January, 1858, assigned his interest in said mill estate and property, with his other property, to Samuel Rodman and Cæsar A. Updike, in trust, for the benefit of his creditors, who, at the March term of this court, 1858, exhibited their bill of supplement and revivor, which was also answered by all the

defendants except Doyle. On the 31st day of December, 1859, the mill and machinery in the bill mentioned were destroyed by fire, and the several insurance companies at which the said mill and machinery were insured, in the aggregate, for the sum of $52,000, were, on the 9th day of January, 1860, by a supplemental bill, made parties defendant to the bill, for the purpose of subjecting what was due on their several policies, to the claim of the complainants, in lieu of said mill and machinery insured.·

The cause came on for hearing, and was heard, at the March term of this court, 1860, and towards the close of the September term of this court, 1860, on the 72d day thereof, being the 3d day of January, 1861, by order of the. court, a decree was entered, that Doyle and Bishop, defendants, and Updike, the ·original complainant, were, from and after the 6th day of September, 1856, copartners, under the firm and style of the Rhode Island Manufacturing Company, and were the owners, in equal shares, of the Coddington Mill estate in the pleadings mentioned; that Bishop and the · Rhode Island Bleaching and Cambric Works had actual notice of the execution and delivery of the deed by the defendant Doyle to the complainant Updike, conveying to him one-third of said mill estate—the said Bishop, before the delivery to him by Doyle, of the deed conveying to said Bishop one-third of said estate — and the Cambric Works, at and before the time of the execution and delivery to them of the deed of the one-third of said estate in the pleadings mentioned ; that at the time the said Rhode Island Bleaching and Cambric Works received their said deed they had actual knowledge of the existence of the said copartnership, and of its ownership of said property and of the liabilities of said copartners as aforesaid; that the defendant Bishop deliver to the complainant the deed of Doyle to Updike, conveying to Updike one-third part of said Coddington Mill estate and property ; that the deed from Doyle to the Rhode Island Bleaching and Cambric Works be declared void and of no effect as to the complainant, and the true and legal title to one-third part of said estate, herein declared to be in said Updike and his assignees, be established ; that the Rhode Island Bleaching and Cambric Works convey—

the manner and form of the conveyance to be approved by Samuel W. Peckham, one of the masters of this court—to said Rodman and Updike, assignees of said Walter W. Updike, the one-third part of said Coddington Mill estate and property; that Edwin Metcalf be appointed receiver of all the estate and property of said copartnership, with full power to collect all debts and demands due to the same, and to administer upon the same for the benefit of the creditors of said copartnership, and of the members thereof as ascertained by this decree ; that the members of said copartnership and the said assignees of Walter W. Updike make, execute, and deliver to the receiver conveyances of their several interests in said estate and property, in manner and form to be approved by the said master, for the purpose of vesting in said receiver the title to all the estate and · property of said copartnership, to be administered according to the principles of equity, under the direction of the court; that the cause be referred to said master, to take an account of the value of said copartnership property at the time of said conveyance from said Doyle to said *defendant, copartner as aforesaid,* of all the dealings and transactions of said corporation and of the said defendants with the said copartnership property, including the real estate described in the pleadings, and of the debts due by the said copartnership and the several amounts thereof, and to whom the same were due, and who are now the holders thereof; and that until the coming in of said report, and the further order of this court, the said defendants, their servants, agents, or assigns, and the servants and agents of such assigns, be, and they hereby are, enjoined from having or exercising any control over said property and estate.

It was further ordered by consent, that the Merchants Insurance Company, of Providence, the North-western Insurance Company, of Oswego, N. Y., the Hartford Fire Insurance Company, of Hartford, Conn., made parties defendant by supplemental bill, pay to the Blackstone Canal Bank, of Providence, the sum of $2213.26, each, in full cancellation of their respective policies of insurance, heretofore issued by them to the Touro Manufacturing Company, and made payable in case of loss to the said Blackstone Canal Bank; that the Providence Washington In-

surance Company, and the Hampden Fire Insurance Company, of Springfield, Mass., made parties defendant by said bill of supplement, pay to the Continental Bank, of Providence, the sum of $2213.70, each, in full cancellation of their respective policies of insurance, heretofore issued by them to the Touro Manufacturing Company, and made payable in case of loss to said Continental Bank; and that the State Mutual Fire Insurance Company, of Providence, also a party defendant, by the aforesaid bill of supplement, pay to said Continental Bank the sum of $4050, in full cancellation of that portion of its policy of insurance, heretofore issued by said State Mutual Fire Insurance Company to said Touro Manufacturing Company, which is made payable in case of loss to said Continental Bank, such payment not to affect any claim under the other portion of said policy; that all the provisions of this decree are made, and the above named payments are to be, without prejudice to the rights of either party to said cause, as to the other insurance money involved therein or in the said supplemental bill, or as to any other matter or question whatever between said parties, or either, or any of them; that the amounts so paid to and received by said banks, respectively, shall be endorsed by them upon the notes respectively held by them, and secured by the mortgage deed given by said Doyle to the Coddington Manufacturing Company, bearing date April 15th, 1856; and that all further questions be reserved until the coming in of the master's report.

At the following term of this court—March term, 1861—and on the 29th day of said term, the plaintiffs and defendants appeared in court, and by consent, caused the case to be entered on the docket, " settled; " but no decree dismissing said bill was entered. On the 36th day of said term, certain original creditors of the Rhode Island Manufacturing Company, who became such when Doyle was sole owner of said concern, presented a petition to the court, complaining of the above entry of " settled " as in fraud of their rights as creditors of said company, and as made without their knowledge or consent: and on the 41st day of said last named term, said entry was taken off by the court, without prejudice to the rights of third parties who had acted *bona fide* thereupon.

The case then went to the master, and before the master, the defendant Bishop objected to his proceeding to take the account between the creditors and the copartners, as not warranted by the prayer of the bill or by the decree, but only the account between the copartners. He also objected to the taking of the account of the value of the copartnership property at any time, as useless for any purpose proper to the bill. The master, notwithstanding, and at the instance of the creditors who appeared before him, took these two accounts as directed by the decree.

The decree being ambiguous as to the time of the value of the copartnership property referred to, whether at the time of the conveyance by Doyle to the Rhode Island Bleaching and Cambric Works, or at the time of Doyle's deed to Bishop,—the former being October 27th, 1856, and the latter, September 27th, 1856,—the master took the account of value at both dates, from the books of the company,—an item in the last mentioned, of $10,448.16, taken from the company's cash book, being objected to by Bishop.

The master then found and reported upon the dealings of the defendants with the company property, including the real estate, which, as no exception was taken to it, need not here be set forth.

The master then proceeded to take the account of the debts due by the copartnership, the several amounts thereof, and to whom the same were due, and who are now the holders thereof, and reported a list of the debts of the Rhode Island Manufacturing Company, Louis J. Doyle, agent, contracted before the formation of the copartnership, up to and including September 6th, 1856, which remain unpaid; a list of such debts contracted before, but paid since the copartnership, and also a list of unpaid debts of the copartnership contracted since the formation thereof, leaving the court to decide the question, whether the copartnership is liable for any debts contracted before the formation thereof.

Amongst the evidence reported by the master, as to these prior debts, was the agreement between Doyle, the seller, and Updike and Bishop, the buyers, of an interest in the Coddington Mill estate and property, and the terms upon which they were to come into the Rhode Island Manufacturing Company as equal

copartners with him. This, and their articles of copartnership were as follows :—

## " PROPOSITION _OF SALE.

" I propose to sell to William W. Bishop and Walter W. Updike, each, one-third of the concern known as the Rhode Island Manufacturing Company, they taking the concern from the time I bought it, say April 10th, 1856, and pay me one-third, each, of the cost of said establishment, from that time to the present ; the cost to be taken from the books of said establishment, which are open, and vouchers for each charge to be given, if required. I have appended to this, the trial balance of the books, to September 1st, showing the cost of said estate to date, so far as bills have been rendered. The mill estate account shows the cost of the estate at auction, April 10th, and lot purchased July 1st, less the sale of the engine and old iron, copper, &c., $40,116.18, (which will be still further reduced by sales of old machinery, now on hand and unsold.) The construction account shows, so far as may be, the cost of the machinery to September 1st, and all labor from time of purchase to August 9th, amounting, in all, to $17,652.01 ; and to be added to the above is the bill of piping, which will not exceed, in my opinion, $5000 ; the bill of painting, which may be $1500 ; a balance due the F. F. & M. Co., which possibly may be $1500 ; and various other small items, which may amount to $1000. · In making these estimates, I would wish to say that I have used my best judgment in regard to them ; but if they exceed, I shall, of course, be able to give vouchers for the same, and shall not expect to be held for any excess. There appears to my credit a balance of account amounting to $62,202.67, consisting principally of the following items, viz.: my notes and cash given for the estate, and amounting to $43,126.98 ; cotton, $8500, ($5000 of same since sold and charged to me.) I also obtained an advance of $10,000, for the security of which I gave a mortgage on an estate of mine in North Providence, and put the capital in the concern. The balance of my account is cash and trade paper advanced by me for labor, freight, and all other items which have been required. I would here state, that in my purchases, I have confined myself

strictly to the rule to buy for cash in every instance where there was the slightest caviling in regard to the manner of payment; and in many instances it* has subjected me to the necessity of paying extra interest, and which I have paid from my own pocket, only charging the estate the amount of cash advanced. I have managed in this manner, so that the credit of the concern might stand unimpaired before starting, feeling well assured, that once in receipt of goods, I could easily keep it so. The bills payable account you will notice, is $13,000; it consists of notes given to Corliss & Nightingale, W. Mason & Co., Taunton, and F. F. & M. Co., for machinery, and Clark & Coggeshall, for coal. The piping is to be paid for at six months from completion. The painting is at my option, cash or time; the F. F. & M. Co., six months; the others, very probably, will be cash. I think it a good plan, for a concern not to have any notes, if possible, floating about the market; for that reason, if practicable, I shall in all cases pay cash for balances, except when I know the notes will go directly to bank. The bills receivable and cash would, of course, go to the reduction of my account. Insurance is for amounts paid out; interest is discounts paid banks in Newport (never any extra) and amounts paid Coddington Co. for notes; all of same being called cash, April 10th. The notes that I have given, I have made payable at various times, as would suit my convenience. The amount of my personal account I shall expect to draw from the concern to the amount of the two notes of $10,000 each. I should think that I had ought to be allowed $2000 for my services in the purchase and since that time; also, for all the trouble I have been to in raising the money and bonuses that I have (I do not wish to be understood that I have paid such an amount for interest) paid; also, as a bonus for the sale, as I wish to be understood that my only inducement to make this sale is the increased facilities for doing the business of the concern, and being more at leisure to give my personal attention to its affairs, which I propose to do, not entering into business of any kind to the prejudice of the business of the concern, without the consent of the parties I sell to. I shall expect a salary of $1000 per annum, in addition to my interest in the concern. I should also expect that none of the parties of the concern should

sell their interest in the concern, without first giving me the privilege of buying, if I choose, at the price the selling party could obtain of any one he can sell to, in a *bona fide* manner. I should not wish to be trammeled, in regard to any small improvements to make, but it should be understood that any change involving large outlays, or any increase or diminishing of the business, should be done by a consultation of the parties hereto. There are some improvements now, that I should wish made, but do not consider them necessary for the success of the business, but in time should feel disposed to make the change its ultimate perfection. I would say that, I have on the lot about 500 tons of Cumberland coal, at a cost of about $6 per ton ; 50 bales cotton, at a cost of $13\frac{1}{2}$ cents per pound. The help are paid in full to August 9th. I should expect to have the option of buying the cotton and other supplies, when and where I saw fit, either for cash or on time, as I thought most advisable, understanding and meaning to pay cash, if for the best interest of the mill. It is impossible for me to say, precisely, what amount of cash or notes I shall need. In regard to shipping goods, the houses I have chosen are,—New York, Lord, Warren, Evans & Co.; Philadelphia, Wood & Erringer ; in Baltimore, Rice, Chase & Co. ; in Boston, probably Gardner Brewer & Co. I am under no obligations to ship to any of these houses, except the first named, and not to them, unless the goods are as well managed as by any other good house. The styles of goods to be manufactured are, 50 looms on 4-4, 68 by 72, and 216 looms 7-8, 68 by 72. The looms are full of the Coddington Company's web, which in the contract of purchase, I was to take, or to weave out at an appraisal ; the latter is most desirable in my opinion. The opinion of Mr. Olney is, that we have not spindles enough to make yarn for only about 200 looms, if they run as they ought; that will leave idle about fifty looms for want of spinning. If any change is made, and which I shall propose, as we have room and power sufficient, would be to put the warp mules on filling, and remove the lower mules by sale, and take the machine shop from that room and fill in ring spinning sufficient for 300 looms, thereby increasing the quantity, 34 looms. By some other slight changes I should make, there would be but two weave shops, one

of 190 looms, and the other of 110 looms, making in all, the 300. The day help would not be increased but a small trifle, (I mean in the manufacturing of the yarn, carding, drawing, &c.,) consequently the production from the last 100 looms run would produce a larger profit, in proportion, than any of the others, and give a good effect to the whole mill, as there are certain parts, which, under the present system, are not doing what they should, though they are doing all that is required. The above are the remarks I wish to make before the sale, in order that everything, so far as may be, should be perfectly understsod, before making a permanent contract. If they are satisfactory to you, I should be happy to arrange terms of payment, &c.

"Yours, truly,

("Signed,)     Louis J. Doyle.

"I shall, of course, expect the purchasers to be bound for any contracts that I have made for the concern."

"We, the undersigned, William W. Bishop and Walter W. Updike, hereby accept the within offer, and hereby agree to pay, each one-third of the cost of said estate and property on the terms within mentioned; and agree to pay our respective portions of the cost from said April 10th, as the respective payments shall fall due, to wit: about seventeen thousand dollars in November; ten thousand, in December, 1856; fifteen thousand, in February, 1857; and ten thousand dollars in April, 1857, and the balance as may be deemed necessary for the use of the company.

"Witness our hands, at Providence, this 6th day of September, 1856.

("Signed,)     W. W. Updike,
       William W. Bishop,
       Louis J. Doyle."

"*Articles of Copartnership made and entered into at Providence, this first day of September, 1856, by and between William W. Bishop, Walter W. Updike and Louis J. Doyle, all of Providence.*

"The parties above named hereby enter into copartnership, for the transaction of the manufacturing business, at Newport,

under the name and style of the Rhode Island Manufacturing Company.

"The capital of said company shall be seventy thousand dollars, (inclusive of real estate,) which shall be owned and paid for by the parties above named, in three equal parts, and may be increased only by the agreement of all the parties in writing.

"It is mutually agreed, that an act of incorporation from the legislature shall be obtained as soon as practicable, and that the company will organize under said act of incorporation forthwith; and as soon as so organized, this copartnership shall be dissolved, and each party shall be entitled to one-third of the stock in said corporation.

"The business of said company shall be conducted by a Treasurer, (for the present, Louis J. Doyle,) who shall keep true and accurate books of account, in which shall be entered all the transactions of the company, and shall, at all times, be open to inspection of the parties; and shall, at any time when requested, cause balance sheets to be made, or account of stock taken, so as to show the real state of the affairs of said company; and a balance sheet shall always be made off at least once a month.

"In testimony whereof, we have hereunto set our hands and seals, at Providence, this 1st day of September, 1856.

("Signed,)        LOUIS J. DOYLE,
                  WILLIAM W. BISHOP,
                  WALTER W. UPDIKE."

"The undersigned, owners of the Coddington Mill, at Newport, have formed a copartnership, under the name and style of the Rhode Island Manufacturing Company, and have appointed Louis J. Doyle treasurer.

("Signed,)        WM. W. BISHOP,
                  W. W. UPDIKE,
                  LOUIS J. DOYLE."

"PROVIDENCE, September 6, 1856."

Other facts are sufficiently stated in the opinion of the court to make it intelligible.

Upon the coming in of the master's report, the defendant

Bishop filed exceptions thereto, the substance of which is suffi-
ciently stated in the opinion of the court, and the cause now came
before the court upon these exceptions.

*William H. Potter, for the defendant Bishop.*

*James Tillinghast, with whom was Bradley, for the creditors,*
cited, *Tillinghast, receiver,* v. *Champlin,* 4 R. I. Rep. 173 ; *Wil-
liamson* v. *Wilson,* 1 Bland. 418, 430 ; *Warren* v. *Robinson,* 1
Hoffman's R. 524 ; *Mann, receiver,* v. *Pentz,* 2 Sandf. Ch, R.
272 ; *Iddings* v. *Bruen,* 4 Ib. 424.

AMES, C. J.   The exceptions to this report, which have been
most strenuously urged upon us at the argument, are, in sub-
stance, that the master has taken the accounts which he was
directed to take by the decree appointing him ; and are rather
objections to the decree as not supported by the allegations of
the bill, than to the master's report.   The master, with a correct
view of his duty, as an officer of the court, to obey the instruc-
tions of the court, took the accounts he was directed to take ; and,
certainly, in this respect his report is unexceptionable.   Without
doubt, a decree may be wrong ; but that is a matter to be at-
tended to when it is entered up ; or, if afterwards, it is found
that it will uselessly involve the parties in an expensive hearing
before the master, application should be made to the court to
reform it in the objectionable particulars ; but as long as it stands,
it is imperative upon the master, who, if he would assist the
court in the matter committed to him, must assist them in the
way in which they have invited his assistance.   If for no other
reason, this class of exceptions to the master's report must be ·
overruled ; since he was right in reporting in conformity to the
decree, though the decree may be wrong in directing him to
examine into and report upon what it directs.

These objections proceed, however, upon an entire misconcep-
tion of the case of the original plaintiff and misapprehension of
the bill which he filed to redress it.   They treat the former as if
it was a case in which none but the plaintiff and defendants
were interested, and the latter, as if it were a mere bill to establish
a legal title in the plaintiff to the Coddington Mill estate and
property.   The case of the plaintiff was of far wider scope than
this, and his bill was aptly framed to meet it.   His case was,

shortly, that having formed a copartnership, by articles, with the defendants, Doyle and Bishop, to carry on the manufacturing business, as the Rhode Island Manufacturing Company, and having purchased and paid for, and assumed heavy liabilities upon the faith of, a deed of one-third of that company's estate and property subject to its debts, which was executed and delivered to him by Doyle, that Doyle and Bishop took advantage of his absence on a distant journey, and suppressed the deed, which Doyle had received from him to put on record, and the articles of copartnership, which he had possession of as treasurer and agent of the company, and totally excluded him, both from the property he had purchased and the copartnership which he had entered into with them. Not only this, but Doyle had sold and conveyed anew to the Rhode Island Bleaching and Cambric Works,—a corporation of which Bishop and the defendant Jackson were the sole members,—the same third of the Coddington Mill estate and property which he had before sold and received the consideration for, from the plaintiff,—the corporation and its members having actual notice of his copartnership and prior deed. The bill was filed on the 9th day of December, 1856, a month after Doyle,—who had become, or was always, insolvent,—had retired from the firm. Bishop had also published his dissolution with it, and had set up a new firm, called the Touro Manufacturing Company, composed of himself and the Cambric Works, which had possessed itself of all the property of the Rhode Island Manufacturing Company, and was using it for the purposes of his new firm. Now the bill, in substance, states this case, and asks that the right of the plaintiff, as a purchaser of one-third of the Coddington Mill estate and property, subject to the debts of the Rhode Island Manufacturing Company, and as a copartner in that company, may be established against the Cambric Works as a subsequent purchaser with notice; that a receiver be appointed to collect and receive the debts due and coming to the Rhode Island Manufacturing Company, and the defendants enjoined from meddling with the same, and from operating the Coddington Mill and machinery; that an account be taken of all the copartnership dealings and transactions, and of the moneys paid and received by the complainant, Doyle and Bishop, respec-

tively, and that Doyle and Bishop be decreed to pay to the complainant what might appear, upon the taking of the accounts, to be due to him from them, and concludes with a prayer for general relief. The bill, in other words, is, in its statements and prayers, as it was necessary that it should be for the relief prayed, a bill for the complete administration of the property of a dissolved copartnership, in which an account is to be taken, both of its property and debts, and as between the copartners, in order that the plaintiff might have what he prayed for,—relief against the copartners who had excluded him. In order to this relief, according to the rules of equity, the portion of the copartnership property to which the plaintiff was entitled, was only the share due to him, after the copartnership debts were paid, and the balances struck between him and his copartners.

Upon the hearing of the bill, the court decided, upon the proofs, that the plaintiff was entitled to the relief prayed for, established the plaintiff's title to one-third of the copartnership property, and his rights as a copartner, appointed a receiver of the copartnership property, and a master to take the accounts necessary to show what the same, and value of the same was, and what had been done with it, who had been, and who were, the creditors of the firm, and the amount of the debt of each. In this the decree went no further, at least, than was necessary to administer, with due attention to the rights of all interested, the assets of the dissolved firm, and to ascertain the sum, if any, which was to be paid to the plaintiff by his copartners who had wrongfully excluded him.

The creditors were not, indeed, parties to this bill or decree; but as the latter provided for the ascertainment, in order to the payment of their debts, they were interested in it. Any creditor could avail himself of it; and after it, could be enjoined from proceeding at law for his debt, for the very reason, that the decree opened to him a mode of recovering it. In *Clarke* v. *the Earl of Ormonde*, which was a bill filed by devisees and legatees, for the execution of the trusts of a will, insisting that certain Irish estates ought to be sold to pay debts and incumbrances, in relief of services of plate and other effects specifically bequeathed, a decree was entered, directing, amongst other things,

a general account of the testator's property and debts. After the decree, upon a motion made in the cause, to enjoin certain creditors of the testator from proceeding at law to levy on the testator's property, and for other purposes, Lord Eldon said, " Ever since the case of *Morrice* v. *Bank of England*, Cas. Temp. Talb. 217, it has been the settled doctrine of the court, that when a decree has been obtained for payment of creditors, it is in the nature of a judgment for all; and the court, therefore, will not permit any particular creditor, by proceeding at law, to disturb that administration of assets, which this court, in the execution of that judgment for all creditors, will decree ; and the court not being in the habit of taking the word of any one as to the amount of the assets or of the debts, till it has a report finding what they are, and considering that equal justice must be done to all, will not, in the meantime, allow any to touch the assets. Even if the creditor has got a judgment before the decree, though he may come in and prove as such, he must not take out execution." *Clarke* v. *Earl of Ormonde*, 1 Jacobs, 108, 123, 124. See, also, *Wilson* v. *Wetherherd*, 2 Meriv. 406 ; *Shewen* v. *Vanderhorst*, 2 Russ. & Mylne, 75 ; 1 Ib. 348 ; *Handford* v. *Storie*, 2 Sim. & Stu. 198 ; *Waring* v. *Robinson and others*, Hoffman's Ch. Rep. 524, 529, 530 ; *Rogers* v. *King*, 8 Paige, 210.

During the term succeeding that in which this decree was entered, the plaintiff's assignees, who before the decree had been made parties to the bill, settled their claim upon the defendants, and sold to them all their interest in the copartnership property, and then came into court and directed the cause to be entered upon the docket as " settled." Certain persons claiming to be creditors of the firm, by petition, apprised the court that this had been done without their knowledge or consent, and in derogation of their rights, when the court,—no decree dismissing the bill having been entered,—ordered the entry of " settled " to be stricken from the docket, and sent the case to the master to make the examinations and report upon the matters directed by the decree.

The objection to the course pursued, in this respect, supposes, that because not parties to the bill, though interested in the decree, the court had no right to act thus upon the petition of the

creditors; that the case was wholly in the disposition of the parties, notwithstanding the decree, and that the creditors should be left to pursue their remedies otherwise, as they were advised. This does not strike us as just, or in accordance with the course of chancery.

Already, as we have seen, the creditors of the firm had reasonably waited for the administration of its assets in their favor through this bill; and after the decree, would have been compelled to wait for the account provided for them by it. The decree is *their* decree, as well as of the parties to the suit, and without *their* consent, the bill can no more be dismissed by the other parties, than by the plaintiff without the consent of the defendants; or by the plaintiff and one of the defendants, without the consent of the other defendants. All parties, and all persons interested in a decree entered in a cause in chancery, have a right to insist upon its execution, and to the aid of the court in executing it. *Waring* v. *Robinson and others, sup.; Shewen* v. *Vanderhorst, sup.; Handford* v. *Storie, sup.; Williamson* v. *Wilson,* 1 Bland. 418, 424–428, 430–432; 2 Daniell's Ch. Pract. 930, n. 1, and cases cited.

Not only, therefore, was the master bound by the decree to take the accounts directed by it, but the decree itself conformed in the particulars objected to, to the equity of the case and the allegations of the bill; and the court, in striking from the docket the entry of "settled," when apprised by the petitioning creditors of the injustice attempted to be done to them, acted only in accordance with its duty.

The principal remaining creditors of the copartnership, or who claim as such, are not those whose debts originated after the 1st day of September, 1856, when the articles were signed, but those whose debts were contracted prior to that time, when Doyle was carrying on business alone, as the Rhode Island Manufacturing Company; and these are contested by Bishop the defendant, as debts of the firm. The master has reported these debts separately from the acknowledged copartnership debts, and submitted the question to us, upon the proof taken and returned by him, whether they are the debts of this copartnership?

. Certainly, they were originally the debts of Doyle alone; and

the matter left for our decision is, whether they were assumed by the incoming partners, Updike and Bishop, as debts of the firm. They all pertain to the business of this mill, and were reckoned in the cost of, or supplies to, it.   Incoming partners may assume the debts of the concern with which they connect themselves ; and this assumption may, both at law and in equity, be proved, either by their express covenant or contract, or be inferred from the terms of it, or from the treatment of such debts by the firm, to the knowledge of the incoming partners, as the debts of the new firm.    Collyer on Partnership, §§ 239, 520–526, and cases cited.

The evidence upon this matter reported to us by the master is derived from both sources of proof, direct and inferential, embracing the original proposition of Doyle, in writing, to sell Updike and Bishop, each, one-third of the concern, and by them in like manner accepted, and the fact that the books were kept, and this class of debts paid by the firm as they came in, with its own debts, precisely as if the incoming partners had been partners from the time when Doyle first bought, and began to prepare for operating the Coddington Mill.

The proposition of sale is based upon the idea of an equal copartnership between the proposer and those to whom it is addressed, of which he is to remain, at a salary, the managing partner or agent, and contains clauses applicable both to the sale and terms of sale, and to the past and future management of the concern.    It begins by proposing to sell to Bishop and Updike, each, one-third of the concern known as the Rhode Island Manufacturing Company, " they taking the concern from the time I bought it,—say April 10th, 1856,—and pay me one-third, each, of the cost of the establishment, from that time to the present ; the cost to be taken from the books of said establishment, which are open, and vouchers for each to be given, if required."    He then goes on to refer to the books and to a trial balance from them up to September 1st, showing the cost of the estate to date, *so far as bills have been rendered.*    He then estimates the amounts of different outstanding accounts, but adds, *if they exceed*, though he shall be able to give vouchers for the same, he shall not expect to be held for any excess.    After speaking of the state of his personal account with the concern, and in another

place, of the amount which he shall expect to draw by reason of it from the concern, he again calls the attention of his proposed partners and purchasers to the bills payable account, its gross amount, and to whom due, and enumerates, amongst these claims, some of the very debts which are now contested. As to outstanding claims for work of different kinds, done or in progress, he gives the terms of payment—credit or cash—as matter interesting to the purchasers. After other remarks explanatory of the books, and of his proposed management of the concern as its agent, he adds, beneath his signature, these words : " I shall, of course, expect the purchasers to be bound for any contracts that I have made for the concern."

Now, this offer in writing is expressly accepted in writing, by both Bishop and Updike, who sign the acceptance jointly with Doyle, each agreeing to pay one-third of the cost of the estate on the terms mentioned, and to pay their respective portions of the cost from said April 10th,—about $17,000 in November ; $10,000 in December, 1856; $15,000 in February; 1857, and $10,000 in April, 1857, and the balance as may be deemed necessary *for the use of the company.*

No one can read this offer and acceptance without perceiving that the parties contracted upon the basis that the incoming partners were to be received as partners from the beginning, entitled to its property at cost, subject to its debts and contracts due and to become due, and for that reason, entitled to know from the books and suppletory explanations of the seller, the precise condition of the concern as to its debts and property on hand. Excluding the closing words of the proposition, we should come to this conclusion ; but it seems to us that these words put the question beyond doubt, being large enough to cover all past liabilities contracted by the seller for the concern. When to this are added the facts, that the books of the firm went on, without any line of demarcation, precisely after as before the accession of these copartners—that the prior debts were paid equally with the subsequent—we are compelled to the conclusion that the property of the Rhode Island Manufacturing Company was purchased by Bishop and Updike, subject to its debts, which are to be paid out of it, and by them, equally with debts contracted after the signature of the articles, and before the dissolution of the firm.

The preceding covers the principal matters of this report; but there are two, in the first of which the master asks of the court the construction of its decree, and the other, which is the basis of an exception.

The decree directs the master to take an account of the value of the copartnership property, " at the time of said conveyance from said Doyle to said defendant copartner as aforesaid, of all the dealings and transactions of said *corporation*, and of the said defendants with the said copartnership property, including," &c. It is obvious that the words " defendant copartner" should read " defendant corporation," as well from the context, as because this was the period when the property of Updike in the firm was wrongfully converted by the joint action of all the defendants, through Doyle's deed, to the use of the Rhode Island Bleaching and Cambric Works,—the corporation intended,—and for this amount Updike would have been entitled to a decree against all the defendants. The master has returned the value of the firm property both at this date,—October 27th, 1856,—and at the date of Doyle's deed to Bishop,—September 27th, 1856; but as Updike's assignees have sold out all his interest in the copartnership property to Bishop, it seems to us, that for all the purposes of the enquiry,—to ascertain Updike's surplus,—the difference, if any, can be of no importance.

This disposes, too, of the exception to the master's allowance of the item of $10,448.16, in the master's report, of the value of the firm property at the above date of Doyle's deed to Bishop,— this sum being found by the cash-book of the company to be on hand at that date. If this were otherwise, however, we see no reason from the evidence reported, to disturb the master's finding, that at that date, it represented fairly the cash of the company on hand.

The conclusion is, that the several exceptions to the master's report be overruled, and the report confirmed ; and that the decree, as to the questions submitted to us by the master, conform to this opinion.